UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

MANUEL YUNGANAULA,

        Plaintiff,

     *v.*

NELSON A. GARCIA, NELSON ABREU,
and ABC CORPORATION *d/b/a*
PRINCESS PIZZA & RESTAURANT,

        Defendants.

**REPORT &
RECOMMENDATION**
19-CV-6247-EK-SJB

---

**BULSARA, United States Magistrate Judge:**

On November 5, 2019, Plaintiff Manuel Yunganaula ("Yunganaula") brought this wage-and-hour and employment-discrimination action against Defendants ABC Corporation d/b/a Princess Pizza & Restaurant ("Princess Pizza"), Nelson A. Garcia ("Garcia"), and Nelson Abreu ("Abreu" and, collectively, "Defendants").[1] On March 11, 2021, Yunganaula moved for default judgment against all Defendants.[2] On March 12, 2021, the Honorable Eric R. Komitee referred the motion to the undersigned for a report and recommendation.[3] For the reasons stated below, it is respectfully recommended that Yunganaula's motion be granted in part and a default judgment be entered against Defendants as outlined below.

---

[1] Compl. dated Nov. 5, 2019 ("Compl."), Dkt. No. 1.

[2] Notice of Pl.'s Mot. for a Default J. Against Defs.' ABC Corporation Princess Pizza & Restaurant, Nelson A. Garcia and Nelson Abreu dated Mar. 11, 2021 ("Mot."), Dkt. No. 33; Mem. of Law in Supp. of Mot. dated Mar. 11, 2021 ("Mem."), Dkt. No. 34.

[3] Order Referring Mot. dated Mar. 12, 2021.

<u>FACTUAL BACKGROUND AND PROCEDURAL HISTORY</u>

Yunganaula worked as a cook at a pizzeria called Princess Pizza & Restaurant, located at 535 Fifth Avenue, Brooklyn, New York, 11215, from August 2006 to May 31, 2019.  (Compl. ¶¶ 17, 19, 22; Decl. of Manuel Yunganaula dated May 11, 2020 ("May 2020 Yunganaula Decl."), Dkt. No. 17, ¶ 1).

Yunganaula alleges that, "upon information and belief," Princess Pizza is a New York corporation with a principal place of business at 535 Fifth Avenue, Brooklyn, New York 11215.  (Compl. ¶ 10).  Abreu resides in Brooklyn, and he "upon information and belief," owns the Princess Pizza premises, "owned" and "operated" the business, and "controlled its day-to-day operations and management."  (*Id.* ¶¶ 13, 20; Decl. of Manuel Yunganaula dated Jan. 11, 2021 ("Jan. 2021 Yunganaula Decl."), Dkt. No. 36, ¶¶ 4–5).  Garcia resides in Brooklyn, and he, "upon information and belief," "owned" and "operated" the business and "controlled its day-to-day operations and management."  (Compl. ¶ 12; Jan. 2021 Yunganaula Decl. ¶ 8).  Garcia is Abreu's brother-in-law, and Abreu sold or transferred at least part of Princess Pizza to Garcia sometime between 2012 and 2014.  (Compl. ¶¶ 24–25; Jan. 2021 Yunganaula Decl. ¶ 6).

Yunganaula alleges that, from 2006 to 2015, he worked 6 days a week—either from 7 AM to 7 PM or 8 AM or 8 PM—totaling 72 hours a week.  (Compl. ¶ 28; May 2020 Yunganaula Decl. ¶ 3).  From 2016 until his termination in May 2019, he worked 6 days a week—12 hours a day 4 days a week, and 13 hours a day 2 days a week—totaling 74 hours per week.  (Compl. ¶ 28; May 2020 Yunganaula Decl. ¶ 3).

Yunganaula occasionally worked additional hours.  During Garcia's annual vacations, Yunganaula worked 7 days, 84 hours per week.  (Compl. ¶ 29; May 2020 Yunganaula Decl. ¶ 4).  Defendants catered parties approximately 3 or 4 days a year, and

on those days Yunganaula worked from 5 AM to 6 or 7 PM for a 13- or 14-hour shift. (Compl. ¶ 31; May 2020 Yunganaula Decl. ¶ 3).  And for 2 or 3 months in 2017, Yunganaula worked 7 days a week, 12 or 13 hours a day.  (Compl. ¶ 30; May 2020 Yunganaula Decl. ¶ 4).

Yunganaula was paid a fixed weekly salary in cash.  (May 2020 Yunganaula Decl. ¶¶ 8, 10).  His weekly pay was $580 in 2013 and 2014, $600 in 2015, $680 in 2016, $760 in 2017, and $800 in 2018 and 2019.  (*Id.* ¶ 5).  He was never provided wage statements or wage notices.  (*Id.* ¶ 12; Compl. ¶¶ 47–48).  He was also not required to keep track of his time, nor did Defendants use any time-tracking system.  (Compl. ¶ 32; May 2020 Yunganaula Decl. ¶ 11).

Yunganaula was required to wear a uniform.  He wore a hat and shirt bearing his name and "Princess Pizza," as well as "uniform pants."  (Compl. ¶¶ 49–50; May 2020 Yunganaula Decl. ¶ 13).  These pants cost $30 a pair, he purchased them 3 or 4 times a year, and he was not reimbursed by Defendants.  (May 2020 Yunganaula Decl. ¶¶ 14–15; *see also* Compl. ¶ 51).  He also says he was not provided "an allowance for the care, maintenance[,] and cleaning of [his] uniforms."  (May 2020 Yunganaula Decl. ¶ 15; *see also* Compl. ¶ 53).

Yunganaula suffered a stroke at work on May 31, 2019.  (Compl. ¶¶ 19, 55; May 2020 Yunganaula Decl. ¶ 16).  It manifested that morning and worsened throughout the day, until he started to "hav[e] trouble speaking" and began doing "strange things, like putting cooked food in the fridge and" serving frozen food to customers.  (Compl. ¶ 56; May 2020 Yunganaula Decl. ¶ 17).  Garcia sent Yunganaula home.  (Compl. ¶ 58; May 2020 Yunganaula Decl. ¶ 18).  Yunganaula does not "remember how [he] got home and" could not "call for help."  (May 2020 Yunganaula Decl. ¶ 19).  Yunganaula's family

3

members found him and brought him to the hospital, where he was diagnosed with a stroke.  (Compl. ¶ 59; May 2020 Yunganaula Decl. ¶ 19).  He was hospitalized for three days.  (Compl. ¶ 62; May 2020 Yunganaula Decl. ¶ 21).

Thereafter, Yunganaula "asked for [his] job back several times."  (May 2020 Yunganaula Decl. ¶ 22).  He details three attempts to go back to work.  On June 9, 2019, Yunganaula returned to Princess Pizza and met with Garcia.  (Compl. ¶¶ 63–64).  Yunganaula told Garcia he would like "to return to work within the next few weeks." (Id. ¶ 64).  Garcia said not to worry and explained that his job would be waiting for him. (Id.).  On June 24, 2019, Yunganaula tried to return to work, but Garcia said he could not do so until kitchen repairs were completed.  (Id. ¶ 65).  Garcia also introduced Yunganaula to the new cook, who appeared to be in his 30s.  (Id.).

On June 28, 2019, Yunganaula returned to Princess Pizza and requested "a letter confirming his employment status and years of employment."  (Id. ¶ 66).  Garcia refused to give him the letter and fired him.  (Id. ¶¶ 66–67).  Yunganaula claims he currently suffers "severe emotional distress, including[ ] insomnia, depression, night sweats, anxiety, stress, shame, embarrassment, sadness, loss of self-worth, loss of appetite, fear for [his] family's livelihood, . . . social isolation," and other "emotional pain and suffering" following his termination.  (May 2020 Yunganaula Decl. ¶ 23).

Yunganaula asserted nine causes of action in his Complaint, including seven wage-and-hour claims: failure to pay overtime in violation of (1) the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 207; and (2) the New York Labor Law ("NYLL") and hospitality industry regulations (the "Hospitality Wage Order"); failure to pay minimum wage in violation of (3) the FLSA and (4) NYLL; (5) failure to pay spread-of-hours compensation in violation of the NYLL and the Hospitality Wage Order; (6)

4

failure to provide wage statements in violation of the NYLL; and (7) failure to reimburse Yunganaula for required uniforms or provide maintenance pay under the Hospitality Wage Order.  (Compl. ¶¶ 72–115).  He also asserted claims for disability discrimination under the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 296, and New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8-107, alleging his stroke constituted a "disability" and Defendants failed to provide him a reasonable accommodation in violation of the NYSHRL and NYCHRL.  (*Id.* ¶¶ 117–34).  He also alleges he was fired for having a disability in violation of both statutes.  (*Id.* ¶¶ 122, 131).

Garcia was served with a summons and the Complaint on November 26, 2019 by personal delivery at Princess Pizza.  (Aff. of Service dated Dec. 4, 2019 ("Garcia Executed Summons"), Dkt. No. 6).  Abreu was also served that day by delivery to Garcia at Princess Pizza, (that is, via a person of suitable age and discretion at Abreu's place of business), and via mail marked "personal and confidential" to the same address.  (Aff. of Service dated Dec. 4, 2019 ("Abreu Executed Summons"), Dkt. No. 8).  On May 8, 2020, the Clerk of Court issued certificates of default against Abreu and Garcia.  (Certificate of Default for Def. Nelson A. Garcia dated May 8, 2020 ("Garcia Certificate of Default"), Dkt. No. 12, at 1; Certificate of Default for Def. Nelson Abreu dated May 8, 2020 ("Abreu Certificate of Default"), Dkt. No. 12, at 2).

After several months of investigation and attempts to identify the precise corporate entity,[4] Princess Pizza was served by delivery to "John Doe," a manager of

---

[4] Mot. dated Mar. 25, 2020, Dkt. No. 10 (describing searches of public records, retention of a private detective, and efforts to contact Princess Pizza); Mot. dated May 19, 2020, Dkt. No. 18 (describing retention of private detective to visit Princess Pizza); Mot. dated June 30, 2020, Dkt. No. 19 (same); Mot. dated Sept. 3, 2020, Dkt. No. 21 (describing process server delay of a single day).

Princess Pizza who stated he was authorized to accept service on behalf of the entity, at the pizzeria on August 6, 2020. (Aff. of Service dated Aug. 11, 2020 ("Princess Pizza Executed Summons"), Dkt. No. 20). On November 2, 2020, the Clerk of Court issued a certificate of default against Princess Pizza. (Certificate of Default for Def. ABC Corporation d/b/a Princess Pizza & Restaurant dated Nov. 2, 2020 ("Princess Pizza Certificate of Default"), Dkt. No. 23). The Court then directed Yunganaula to move for default judgment against all Defendants. (Order dated Dec. 28, 2020). On January 11, 2021, Yunganaula filed his first combined default judgment motion. (Notice of Pl.'s Mot. for a Default J. Against Defs. ABC Corporation d/b/a Princess Pizza & Restaurant, Nelson A. Garcia and Nelson Abreu dated Jan. 11, 2021, Dkt. No. 26). On February 18, 2021, the Court directed Yunganaula to explain why the motion should not be denied pursuant to Local Civil Rule 55.2. (Order to Show Cause dated Feb. 18, 2021, Dkt. No. 31). Yunganaula withdrew the motion, (Letter dated Feb. 24, 2021, Dkt. 32), and renewed it on March 11, 2021, (Mot.).

In his renewed motion, Yunganaula seeks $880,341.09 in recovery, consisting of $270,405.30 in unpaid overtime wages, $18,340.50 in unpaid spread-of-hours compensation, $4,644.80 in uniform costs and maintenance pay, $293,390.60 in liquidated damages, $130,779.89 in prejudgment interest on the wage-and-hour violations, $26,895.00 in back pay, emotional distress damages of $125,000, $37,060.00 in attorney's fees, and $720.00 in costs. (Mem. at 15–25; Proposed Default J. ("Proposed Default J."), attached as Ex. F to Decl. of Douglas Lipsky dated Mar. 11,

2021 ("Lipsky Decl."), Dkt. No. 35).[5]  The renewed motion was served on each Defendant by mail.  (Aff. of Service dated Mar. 11, 2021 ("Default J. Service"), Dkt. No. 37).  For the reasons below, the Court respectfully recommends the motion be granted in part and default judgment be entered as outlined below.

## DISCUSSION

I.   Entry of Default

Rule 55 of the Federal Rules of Civil Procedure establishes a two-step process for obtaining a default judgment.  *See Shariff v. Beach 90th St. Realty Corp.*, No. 11-CV-2551, 2013 WL 6835157, at *3 (E.D.N.Y. Dec. 20, 2013) (adopting report and recommendation).  First, "[w]hen a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise, the clerk must enter the party's default."  Fed. R. Civ. P. 55(a).  Second, after default has been entered, and the defendant fails to appear or move to set aside the default under Rule 55(c), the Court may, on plaintiff's motion, enter a default judgment against that defendant.  *Id*. r. 55(b)(2).

The Clerk of Court entered defaults against Abreu and Garcia on May 8, 2020, (Abreu Certificate of Default; Garcia Certificate of Default), and against Princess Pizza on November 2, 2020, (Princess Pizza Certificate of Default).

A threshold question before reaching liability or damages is whether Defendants' conduct is sufficient to warrant default judgment being entered.  In determining whether to enter a default judgment, the Court is guided by the same factors that apply

---

[5] Yunganaula has abandoned his minimum wage claims.  (Mem. at 2 n.1).  And he only seeks relief for disability discrimination, not reasonable accommodation.  (*See id*. at 10–12, 20–22).

to a motion to set aside entry of a default.  *See Enron Oil Corp. v. Diakuhara*, 10 F.3d 90, 96 (2d Cir. 1993).  "These widely accepted factors are: (1) whether the default was willful; (2) whether setting aside the default would prejudice the adversary; and (3) whether a meritorious defense is presented."  *Id.*; *see also Lopez v. Royal Thai Plus, LLC*, No. 16-CV-4028, 2018 WL 1770660, at *2–3 (E.D.N.Y. Feb. 6, 2018), *report and recommendation adopted*, 2018 WL 1770555 (Apr. 12, 2018).

First, the failure by Defendants to respond to the Complaint demonstrates their default was willful.  *See, e.g., Indymac Bank v. Nat'l Settlement Agency, Inc.*, No. 07-CV-6865, 2007 WL 4468652, at * 1 (S.D.N.Y. Dec. 20, 2007).  Each Defendant had sufficient notice of the present litigation and were properly served with a summons and the Complaint.  (Garcia Executed Summons; Abreu Executed Summons; Princess Pizza Executed Summons).  The motion for default judgment and supporting documents were served on each of them via mail.  (Default J. Service).  Notwithstanding this notice and service, Defendants did not respond to the Complaint, did not appear, and have not in any way attempted to defend themselves.[6]

As to the second factor, Yunganaula would be prejudiced if the motion for default were denied because "[w]ithout the entry of a default judgment, Plaintiff would be unable to recover for the claims adequately set forth in the Complaint."  *Sola Franchise*

---

[6] As detailed *supra* n.4, counsel made extensive efforts to identify the precise corporation that is Princess Pizza.  Even though the particular corporate entity was not identified, it was properly served in accordance with New York law.  (Princess Pizza Executed Summons).  "[W]here an unidentified defendant has been properly served with a complaint and has nevertheless failed to answer or otherwise respond," the inability to identify the precise corporate entity name "does not impede a court's ability to enter judgment against it."  *Navika Cap. Grp., LLC v. Doe*, No. 14-CV-5968, 2017 U.S. Dist. LEXIS 2926, at *13–14 (E.D.N.Y. Jan. 6, 2017), *report and recommendation adopted*, 2017 U.S. Dist. LEXIS 40820 (Mar. 20, 2017).

*Corp. v. Solo Salon Studios Inc.*, No. 14-CV-946, 2015 WL 1299259, at *15 (E.D.N.Y. Mar. 23, 2015) (adopting report and recommendation); *Trs. of the Empire State Carpenters Annuity, Apprenticeship, Lab. Mgmt. Coop., Pension & Welfare Funds v. Lynnview Constr. Corp.*, No. 12-CV-5644, 2013 WL 4852312, at *7 (E.D.N.Y. Sept. 10, 2013) (adopting report and recommendation).

Third, the Court cannot conclude there is any meritorious defense to Yunganaula's allegations because no Defendant appeared and no defense has been presented to the Court. *E.g.*, *United States v. Hemberger*, No. 11-CV-2241, 2012 WL 1657192, at *2 (E.D.N.Y. May 7, 2012); *Indymac Bank*, 2007 WL 4468652, at *1.

As a result, all three factors permit entry of a default judgment. The Court now turns to the liability imposed and damages and other relief to be awarded.

II.   <u>Liability</u>

When a defendant defaults, a court, on consideration of a plaintiff's default judgment motion, "is required to accept all of the [plaintiff's] factual allegations as true and draw all reasonable inferences in its favor." *Finkel v. Romanowicz,* 577 F.3d 79, 84 (2d Cir. 2009). In addition, a party's default is deemed as an admission of all of well-pleaded allegations of liability. *See Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp.*, 973 F.2d 155, 158 (2d Cir. 1992); *Morales v. B & M Gen. Renovation Inc.*, No. 14-CV-7290, 2016 WL 1266624, at *2 (E.D.N.Y. Mar. 9, 2016), *report and recommendation adopted*, 2016 WL 1258482 (E.D.N.Y. Mar. 29, 2016).

Next, the court must determine "whether the unchallenged facts constitute a legitimate cause of action." 10A Charles Alan Wright & Arthur R. Miller et al., *Federal Practice and Procedure* § 2688.1 (4th ed. 2021) ("Once the default is established, defendant has no further standing to contest the factual allegations of plaintiff's claim

for relief.  Even after default, however, it remains for the court to consider whether the unchallenged facts constitute a legitimate cause of action, since a party in default does not admit conclusions of law."); *Labarbera v. ASTC Labs. Inc.*, 752 F. Supp. 2d 263, 270 (E.D.N.Y. 2010) (adopting report and recommendation).

As outlined below, the Court finds Defendants jointly and severally liable for violations of the overtime provisions of FLSA and NYLL, the spread-of-hours provisions of the NYLL and corresponding hospitality industry regulations, the wage-statement provisions of the Wage Theft Protection Act, and the disability discrimination provisions of the NYSHRL and NYCHRL.  The Court recommends the motion for default be denied with respect to uniform purchase costs and maintenance pay.

A.   Overtime Claims

Yunganaula has alleged claims for violations of both FLSA and NYLL's respective overtime requirements.  Both are addressed below.

1.   FLSA

a.   Threshold Requirements

To establish a claim under FLSA, Yunganaula must prove (1) Defendants are employers subject to FLSA; (2) he is "an employee within the meaning of [FLSA]"; and (3) the employment relationship is not exempted from FLSA.  *Edwards v. Cmty. Enters., Inc.*, 251 F. Supp. 2d 1089, 1098 (D. Conn. 2003) (citing *Tony & Susan Alamo Found. v. Sec'y of Lab.*, 471 U.S. 290, 295 (1985)).

i.   *Employers Subject to FLSA*

First, Defendants are subject to FLSA.  Employers who have employees "engaged in commerce or in the production of goods for commerce" ("individual coverage") or "employed in an enterprise engaged in commerce or in the production of goods for

10

commerce" ("enterprise coverage") are subject to FLSA's overtime requirements.  29 U.S.C. §§ 206(a), 207(a)(1); *Shim v. Millennium Grp.*, No. 08-CV-4022, 2009 WL 211367, at *2 (E.D.N.Y. Jan. 28, 2009).  Enterprise coverage—which exists where an employer has (1) employees engaged in commerce or in the production of goods for commerce; and (2) an annual gross volume of sales greater than $500,000—triggers these obligations.  29 U.S.C. § 203(s)(1)(A); *see also Padilla v. Manlapaz*, 643 F. Supp. 2d 298, 300 (E.D.N.Y. 2009).

Yunganaula has established enterprise coverage.  As to the first requirement, Yunganaula alleges that Princess Pizza "has employees that handle goods and materials that have been produced for and moved in commerce," such as "cleaning products, food and beverages."  (Compl. ¶ 11).  Such handling of goods is sufficient to satisfy the interstate commerce requirement for enterprise coverage.  *See Archie v. Grand Cent. P'ship, Inc.*, 997 F. Supp. 504, 530–31 (S.D.N.Y. 1998); *see also Juarez v. Wheels Pizza Inc.*, No. 13-CV-261, 2015 WL 3971732, at *2 & n.3 (S.D.N.Y. June 30, 2015) (finding plaintiff's allegations that he handled goods in interstate commerce while working at a pizza stand, including soft drinks and beer, were sufficient to establish that the pizza stand was engaged in interstate commerce).  As to the second requirement, Yunganaula alleges that Princess Pizza had, upon information and belief, an "annual gross volume of business" of "at least $500,000.00."  (Compl. ¶ 11).  This is sufficient on default to establish enterprise coverage.  *See, e.g.*, *Herrera v. Tri-State Kitchen & Bath, Inc.*, No. 14-CV-1695, 2015 WL 1529653, at *3 (E.D.N.Y. Mar. 31, 2015) (adopting report and recommendation) (finding plaintiffs' allegations "upon information and belief" that defendants' gross revenues were greater than $500,000 were sufficient to establish enterprise coverage).  The Court thus concludes that Princess Pizza is subject to FLSA.

Yunganaula has also demonstrated that Abreu and Garcia are "employers" under FLSA. Under FLSA, an "employer" is "any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d). An individual may be jointly and severally liable to an employee for unpaid wages under FLSA where the individual exercises "operational control" over that employee. *Irizarry v. Catsimatidis*, 722 F.3d 99, 110 (2d Cir. 2013) ("A person exercises operational control over employees if his or her role within the company, and the decisions it entails, directly affect the nature or conditions of the employees' employment.").

To determine whether an individual is an "employer" under FLSA, courts look to the "economic reality" of the employment relationship. *Id.* at 104. That is, courts took to "whether the alleged employer (1) had the power to hire and fire the employees; (2) supervised and controlled employee work schedules or conditions of employment; (3) determined the rate and method of payment; and (4) maintained employment records." *Carter v. Dutchess Cmty. Coll.*, 735 F.2d 8, 12 (2d Cir. 1984) (quoting *Bonnette v. Cal. Health & Welfare Agency*, 704 F.2d 1465, 1470 (9th Cir. 1983)); *see, e.g.*, *Irizarry*, 722 F.3d at 104–06 (applying *Carter*). "[T]he 'economic reality' test encompasses the totality of the circumstances," and no single factor is dispositive. *Herman v. RSR Sec. Servs. Ltd.*, 172 F.3d 132, 139 (2d Cir. 1999).

Applying the four *Carter* factors and looking to the totality of the circumstances, the Court finds that Abreu and Garcia were both Yunganaula's employers. Garcia and Abreu had the power to hire and fire employees (for example, Abreu hired Yunganaula and Garcia fired him). (Jan. 2021 Yunganaula Decl. ¶¶ 2–3, 11). Both "supervised and controlled" Yunganaula's conditions of employment. Abreu "supervised [his] work, told [him] what [he] was supposed to cook, [and] set [his] work schedule and [his] hours."

(*Id.* ¶ 3).  Garcia similarly supervised Yunganaula and other employees from 2014 onwards.  (*Id.* ¶ 9).  Abreu and Garcia also controlled Yunganaula's rate and method of pay: Abreu "decided how much and how often [he] was going to get paid" and paid him weekly in cash from 2006 to 2014.  (*Id.* ¶ 3).  And starting in 2014, Garcia "also became the person who determined the amount and method of how [Yunganaula] and other employees were going to get paid."  (*Id.* ¶ 8).  He paid Abreu from 2014 to 2019.  (*Id.*). And finally, both "maintained at least some records about [Yunganaula's] employment," which Yunganaula knew because they provided Yunganaula letters verifying his employment. (*Id.* ¶ 14).  This is sufficient to establish Garcia and Abreu were Yunganaula's employers under FLSA.  *See, e.g.*, *Coley v. Vannguard Urb. Improvement Ass'n*, No. 12-CV-5565, 2018 WL 1513628, at *4 (E.D.N.Y. Mar. 29, 2018) (finding executive director who admitted he "was authorized to hire, fire, discipline, assign employees, set work schedules, determine the rate and method of wage payments, establish classification of employees and maintain employment records" individually liable as employer under FLSA); *Gibson-Hawley v. USA Mgmt. LLC*, No. 17-CV-4346, 2018 WL 4691576, at *7 (E.D.N.Y. Sept. 14, 2018) (finding company owner and director who "controlled employee work schedules, payment method, and employment records" individually liable as employer under FLSA), *report and recommendation adopted*, 2018 WL 4689000 (Sept. 28, 2018).

## ii.   *Employees Covered By FLSA*

Second, Yunganaula has demonstrated he is an "employee" within the meaning of FLSA.  Any "individual employed by an employer" is protected under FLSA's overtime provisions.  29 U.S.C. § 203(e)(1).  To determine whether an individual is "employed," "the ultimate question is whether the putative employee is economically dependent on

the putative employer.  In other words, the court must determine 'whether, as a matter of economic reality, the worker[ ] depend[s] upon someone else's business for the opportunity to render service or [is] in business for [himself]." *Velu v. Velocity Express, Inc.*, 666 F. Supp. 2d 300, 306 (E.D.N.Y. 2009) (alterations in original) (quoting *Godoy v. Rest. Opportunity Ctr. of N.Y., Inc.*, 615 F. Supp. 2d 186, 192–93 (S.D.N.Y. 2009)). The Complaint alleges that Yunganaula was employed by Defendants, (Compl. ¶¶ 11–13, 19), and there is no basis from the Complaint to infer anything other than Yunganaula was working for a business owned and operated by someone else.

### iii.    *Exempt Employment Relationship*

And third, there is no basis from the Complaint to infer that the employment relationship between Yunganaula and Defendants is exempt from FLSA.  *See* 29 U.S.C. § 203 (FLSA "definitions" and exemptions).

### b.    Statute of Limitations

Yunganaula alleges that, because Defendants' violations of the FLSA were willful, a three-year statute of limitations applies under 29 U.S.C. § 255(a).  (Compl. ¶ 80). Absent willfulness, a two-year statute of limitations would apply.  29 U.S.C. § 255(a). Yunganaula was employed by Defendants from August 2006 to June 28, 2019; he initiated this action on November 5, 2019.  (Compl.).  Because Yunganaula asserted his FLSA claim within six months of his employment, this action is timely whether or not he has demonstrated "willfulness."  The scope of the damages available for this period is addressed below.

### c.    Overtime Claim

FLSA section 207(a)(1) requires that an employee working "in excess of" 40 hours in a given workweek will be compensated for that "excess work 'at a rate not less

than one and one-half times the regular rate at which he is employed' (*i.e.* time and a half)." *Lundy v. Cath. Health Sys. of Long Island Inc.*, 711 F.3d 106, 114 (2d Cir. 2013) (quoting 29 U.S.C. § 207(a)(1)).  In *Lundy*, the Second Circuit articulated "the degree of specificity needed to state an overtime claim under FLSA."  *Id.*  A plaintiff must "sufficiently allege 40 hours of work in a given workweek as well as some uncompensated time in excess of the 40 hours."  *Id.*  Or put differently, to survive a motion to dismiss an FLSA overtime claim, a plaintiff must allege that in at least one workweek he or she worked at least 40 hours, and also worked some uncompensated time in that week in excess of the 40 hours.  *See id.*

This requirement is not satisfied if a plaintiff generally alleges she was not paid for overtime hours worked.  *Nakahata v. N.Y.-Presbyterian Healthcare Sys. Inc.*, 723 F.3d 192, 201 (2d Cir. 2013).  The requirement that plaintiffs "must allege overtime without compensation in a 'given' workweek [i]s not an invitation to provide an all-purpose pleading template alleging overtime in 'some or all workweeks.'"  *Dejesus v. HF Mgmt. Servs., LLC*, 726 F.3d 85, 90 (2d Cir. 2013) (quoting *Lundy*, 711 F.3d at 114).  Nor is it acceptable for a plaintiff to just "track[ ] the statutory language of the FLSA" without alleging any "particular facts sufficient to raise a plausible inference of an FLSA overtime violation."  *Id.* at 89.

Rather, "[p]laintiffs must provide sufficient detail about the length and frequency of their unpaid work to support a reasonable inference that they worked more than forty hours in a given week."  *Nakahata*, 723 F.3d at 201.  Only with such factual context will a plaintiff's overtime claim move from merely "conceivable to plausible."  *Dejesus*, 726 F.3d at 90 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "What aspects of [a] [p]laintiff[ ]'[s] position, pay, or dates of employment are necessary to

15

state a plausible claim for relief . . . is a case-specific inquiry for the trial court." *Nakahata*, 723 F.3d at 201 (emphasis removed). A plaintiff "[i]s not required to keep careful records and plead [her] hours with mathematical precision," instead, she may draw on her "memory and experience" to "provid[e] complaints with sufficiently developed factual allegations" to support the claim that she was denied overtime in violation of FLSA. *Dejesus*, 726 F.3d at 90.

Yunganaula's overtime claim contains the necessary factual allegations to state a FLSA overtime claim. Yunganaula asserts that, during the period within FLSA's statute of limitations, he "typically worked 6 days per week, working 12-hour days for 4 days and 13-hour days for 2 days a week, without a 30-minute lunch break, totaling at least 74 hours per week." (Compl. ¶ 28; May 2020 Yunganaula Decl. ¶ 3). He also alleges that there were three situations when he worked additional hours: (1) once every year when Garcia went on vacation for 4 or 5 weeks, Yunganaula worked 7 days a week, totaling at least 84 hours per week, (Compl. ¶ 29; May 2020 Yunganaula Decl. ¶ 4); (2) in 2017, he worked 7 days a week 12 to 13 hours a day for two to three months, amounting to at least 86 hours per week, (Compl. ¶ 30; May 2020 Yunganaula Decl. ¶ 4); and (3) when Princess Pizza would cater parties—3 or 4 times a year—Yunganaula would start work early and work for a 13- or 14-hour shift, totaling 73 or 74 hours per week. (Compl. ¶ 31; May 2020 Yunganaula Decl. ¶ 3). These are specific weeks, with specific time periods, in which Yunganaula has alleged he worked more than 40 hours per week.

Under FLSA, unpaid overtime wages are calculated by first determining the employee's regular hourly rate and then multiplying by 1.5. *See* 29 U.S.C. § 207(a)(1). For employees compensated on a "weekly salary basis" like Yunganaula, the "regular

hourly rate, on which time and a half must be paid, is computed by dividing the salary by the number of hours which the salary is intended to compensate."  29 C.F.R. § 778.113(a).  If this rate falls below the applicable minimum wage, overtime wages are calculated using the applicable minimum.  *See id.* § 778.5.  The applicable minimum wage here is the New York state minimum wage.  *See id.*

Under this framework, Yunganaula's weekly salary has stated a claim for overtime under FLSA.[7]  Assuming his pay was intended to cover the hours he actually worked, the calculations are set out below.

|  | **2017** | **2018** | **2019** |
|---|---|---|---|
| Hours Per Week | 74 | 74 | 74 |
| Weekly Salary | $760 | $800 | $800 |
| FLSA Regular Hourly Rate | $11.00 | $13.00 | $15.00 |
| FLSA Overtime Rate | $16.50 | $19.50 | $22.50 |
| Weekly Overtime Wages Owed | $561.00 | $663.00 | $765.00 |
| Weekly Straight Time Wages Paid | $440.00 | $520.00 | $600.00 |
| Weekly Overtime Wages Paid | $320.00 | $280.00 | $200.00 |
| Weekly Overtime Wages Due | $241.00 | $383.00 | $565.00 |

That is, from 2016 to May 2019, Yunganaula typically worked 74 hours a week.  (Compl. ¶ 28; May 2020 Yunganaula Decl. ¶ 3).  In 2017, he was paid $760 per week in 2017, and

---

[7] Some district courts have held that, under FLSA, "[t]here is a 'rebuttable assumption that a weekly salary covers 40 hours,' and the 'employer can rebut the presumption by showing an employer-employee agreement that the salary cover a different number of hours.'"  *See, e.g.*, *Newman v. W. Bar & Lounge, Inc.*, No. 20-CV-1141, 2021 WL 2401176, at *10 (E.D.N.Y. June 11, 2020) (quoting *Giles v. City of New York*, 41 F. Supp. 2d 308, 317 (S.D.N.Y. 1999)) (collecting cases).  The Second Circuit has not addressed this framework, but, assuming it applies, Defendants have failed to rebut the presumption by defaulting, *id.*, and Yunganaula's hourly rate would be calculated by dividing his weekly pay by 40 hours.  In other words, the calculations would be the same as for NYLL overtime claims, as set forth *infra*, and the Court would still find Yunganaula had stated a FLSA claim for unpaid overtime.

$800 per week in 2018 and 2019.  (Compl. ¶¶ 38–40; May 2020 Yunganaula Decl. ¶ 5).
As a result, his regular hourly rate was $10.27 in 2017, which was below the applicable
New York State minimum wage for 2017, $11.00.  N.Y. Lab. Law § 652(1)(a)(i).[8]  Using
the applicable minimum wage, his overtime rate was $16.50.  He worked 34 overtime
hours a week and was therefore entitled to $561.00 in overtime per week.  Because he
was only paid $320.00 in overtime wages, he is owed $241.00 in overtime pay per week
for 2017.

In 2018, his regular hourly rate was $10.81, which was below the New York State
minimum wage for 2018, which was $13.00.  N.Y. Lab. Law § 652(1)(a)(i).  Using the
applicable minimum wage, his overtime rate was $19.50.  He worked 34 overtime hours
a week and was thus entitled to $663.00 in overtime per week.  Because he was only
paid $280.00 in overtime wages, he is owed $383.00 in overtime pay per week.  And in
2019, his regular hourly rate was also $10.81, which is below the applicable New York
State minimum wage for 2019, $15.00.  *Id.*  Using the applicable minimum wage, his
overtime rate was $22.50, and he was entitled to $765.00 in overtime pay per week.
Because he was only paid $200.00 in overtime pay, he is owed $565.00 in overtime pay
per week.

Therefore, Yunganaula has stated a claim for overtime under FLSA.

2.   NYLL

a.   Threshold Requirements

A covered "employee" under NYLL is "any individual employed or permitted to
work by an employer in any occupation."  N.Y. Lab. Law § 651(5).  There are a number of

---

[8] Princess Pizza was located in Brooklyn, and it had 11 or more employees.
(Compl. ¶¶ 17–18).

exemptions to that definition, none of which are applicable in this case.  *See id.*  The Complaint alleges that Yunganaula was an employee of Princess Pizza, (Compl. ¶¶ 15–16, 19, 22–23), and that it is a regulated employer under NYLL, (*id.* ¶ 10).  The Court accepts these factual allegations as true and concludes that NYLL applies to Yunganaula. *See Gonzales v. Gan Isr. Pre-Sch.*, No. 12-CV-6304, 2014 WL 1011070, at *9 (E.D.N.Y. Mar. 14, 2014) (adopting report and recommendation).

Yunganaula also asserts that Abreu and Garcia were his "employers" within the meaning of the NYLL and are individually liable for any unpaid overtime wages. "District courts in this Circuit 'have interpreted the definition of employer under the New York Labor Law coextensively with the definition used by the FLSA.'"  *Jin Dong Wang v. LW Rest., Inc.*, 81 F. Supp. 3d 241, 258 (E.D.N.Y. 2015) (quoting *Spicer v. Pier Sixty LLC*, 269 F.R.D. 324, 335 n.13 (S.D.N.Y. 2010)) (collecting cases); *accord Coley*, 2018 WL 1513628, at *4.  In light of the reasoning in Part I.A.1.a, *supra*, the Court concludes Garcia and Abreu were Yunganaula's "employers" under the NYLL.

### b.   Overtime Claim

NYLL's overtime provision specifies that eight hours constitutes a "legal day's work."  N.Y. Lab. Law § 160(3).  The Hospitality Wage Order provides that "[a]n employer shall pay an employee for overtime at a wage rate of 1 1/2 times the employee's regular rate for hours worked in excess of 40 hours in one workweek."  12 N.Y.C.R.R. § 146-1.4.

The Hospitality Wage Order states that an employee's hourly wage rate is determined by dividing weekly wages by the lesser of 40 or actual hours worked; the assumption embedded in such a calculation is that, unless evidence suggests otherwise, none of the paid wages are to be credited to overtime.  *See id.* § 146-3.5(b) ("If an

employer fails to pay an employee an hourly rate of pay, the employee's regular hourly rate of pay shall be calculated by dividing the employee's total weekly earnings . . . by the lesser of 40 hours or the actual number of hours worked by that employee during the work week."). Put differently, for Yunganaula in any given week of 2017, the $760 he was paid was for the first 40 hours he worked; for the additional 34 overtime hours he worked, he received nothing.

By way of example, from 2016 to May 2019, Yunganaula typically worked 74 hours a week. (Compl. ¶ 28; May 2020 Yunganaula Decl. ¶ 3). He was paid $760 per week in 2017, and $800 per week in 2018 and 2019. (Compl. ¶¶ 38–40; May 2020 Yunganaula Decl. ¶ 5). As a result, his hourly wage rate in 2017 was $19.00 ($760 divided by 40 hours, the lesser of 40 and 74), and he was entitled to $28.50 in hourly overtime pay ($19.00 multiplied by 1.5). Because he worked 34 hours of overtime per week, he is entitled to $969.00 in overtime wages per week. And because in 2018 and 2019, his hourly wage rate was $20.00 ($800 divided by 40 hours), he was entitled to $30.00 in hourly overtime pay. And because he worked 34 hours of overtime per week, he is entitled to $1020.00 in overtime wages per week. He was paid for less than that.

Under these circumstances, Yunganaula has alleged a claim for unpaid overtime wages under NYLL. *See, e.g.*, *Romero v. Rung Charoen Sub, Inc.*, No. 16-CV-1239, 2017 WL 4480758, at *10 (E.D.N.Y. Sept. 30, 2017) ("Because the regular rates of pay under the NYLL are calculated by dividing Plaintiff's total weekly earnings by 40 hours per week, Plaintiff's total weekly earnings necessarily do not include overtime premiums. Accordingly, Defendants violated the overtime provisions of the NYLL."); *Miguel v. Mi Bella Puebla Corp.*, No. 16-CV-1593, 2017 WL 4838820, at *5 (E.D.N.Y. Sept. 6, 2017)

(performing same NYLL overtime calculation), *report and recommendation adopted*, 2017 WL 4838761 (Oct. 24, 2017).

B.    Spread of Hours

Yunganaula also alleges a violation of NYLL's spread-of-hours provision, which requires that an employee in a restaurant receive "one additional hour of pay at the basic minimum hourly wage rate" in addition to the minimum wage for any day the employee works 10 or more hours.  12 N.Y.C.R.R. § 146-1.6(a).  This spread-of-hours protection extends to all restaurant employees regardless of their regular rate of pay. *Xochimitl v. Pita Grill of Hell's Kitchen, Inc.*, No. 14-CV-10234, 2016 WL 4704917, at *7 (S.D.N.Y. Sept. 8, 2016), *report and recommendation adopted*, 2016 WL 6879258 (Nov. 21, 2016).  That is, the spread-of-hours benefit is not limited to those employees earning minimum wage.

Because Yunganaula alleges he worked 12 or 13 hours a day, (Compl. ¶¶ 27–28), and did not receive an additional one hour's pay, (*id.* ¶ 105), he has stated a claim for violation of NYLL's spread-of-hours provision, *e.g., Miguel*, 2017 WL 4838820, at *5.

C.    Uniform Violations

Yunganaula alleges two separate violations of the NYLL with respect to uniforms. First, he asserts he was not reimbursed for the cost of purchasing parts of his required uniform.  12 N.Y.C.R.R. § 146-1.8(a) ("When an employee purchases a required uniform, he or she shall be reimbursed by the employer for the total cost of the uniform no later than the next payday.").  And second, he asserts he was not reimbursed for maintenance costs of this required uniform.  *Id.* § 146-1.7(a).  Yunganaula's allegations, even taken as true, are insufficient to state either claim.

1.      Uniform Purchase Costs

Yunganaula was required to wear a uniform at Princess Pizza: a hat and shirt with "Princess Pizza" and his name on them, and "uniform pants." (Compl. ¶¶ 49–50; May 2020 Yunganaula Decl. ¶ 13). Yunganaula asserts his uniform pants cost $30 a pair, he had to purchase them 3 or 4 times a year, and he was not reimbursed by Defendants. (May 2020 Yunganaula Decl. ¶¶ 14–15; *see also* Compl. ¶ 51). The Court finds Yunganaula has not demonstrated his uniform pants were "required uniforms" under New York law and recommends this claim be denied.

Under New York law, employers are obligated to reimburse employees for the cost of "required uniforms." 12 N.Y.C.R.R. § 146-1.8(a) ("When an employee purchases a required uniform, he or she shall be reimbursed by the employer for the total cost of the uniform no later than the next payday."). A "required uniform" is defined as "clothing required to be worn while working at the request of an employer . . . *except* clothing that may be worn as part of an employee's ordinary wardrobe." *Id.* § 146-3.10(a). An employee's "ordinary wardrobe" is "ordinary basic street clothing selected by the employee where the employer permits variations in details of dress." *Id.* § 146-3.10(b); *e.g.*, *Salinas v. Starjem Rest. Corp.*, 123 F. Supp. 3d 442, 476 (S.D.N.Y. 2015) (finding plaintiff demonstrated "ties and shirts of a particular color and style" supplied by employer were "required uniforms" under New York law, but failed to show "black dress pants, black dress shoes, and black belt" that were not supplied by employer were not "required uniforms").

Unlike the uniform hat and shirt, Yunganaula does not allege the pants were required to have any branding or that he was required to purchase them from Defendants. *See Salinas*, 123 F. Supp. 3d at 476. In fact, he makes no allegations about

color, style, or fit such that the Court could conclude these pants could not be worn as

his "ordinary wardrobe." As a result, he has failed to meet his burden on default and

this claim must be denied. *See, e.g.*, *Cocoletzi v. Fat Sal's Pizza II, Corp.*, No. 15-CV-

2696, 2018 WL 7291455, at *20 (S.D.N.Y. Dec. 6, 2018) ("With regard to the work

clothes, . . . he has not pleaded any facts that suggest that the clothes he allegedly

purchased could not have been 'worn as part of [his] ordinary wardrobe,' *see* 12

N.Y.C.R.R. § 146-3.10, or that the clothing was 'specifically required for the performance

of the employer's particular work,' 29 C.F.R. § 531.35. Accordingly, this Court finds that

there is an insufficient basis in the record for awarding Villar the amount he spent on

'work clothes.'" (second alteration in original)), *report and recommendation adopted*,

2019 U.S. Dist. LEXIS 123422 (Jan. 3, 2019).

## 2.   Uniform Maintenance Pay

If an employer requires employees to wear uniforms but does not "maintain"—

meaning "washing, ironing, dry cleaning, alterations, repair, or any other maintenance

necessary"—those uniforms, the employer must provide uniform maintenance pay to

compensate employees for the cost of maintaining their uniforms. 12 N.Y.C.R.R. § 146-

1.7(a). There is an exception

> where required uniforms
> (1) are made of "wash and wear" materials;
> (2) may be routinely washed and dried with other personal garments;
> (3) do not require ironing, dry cleaning, daily washing, commercial laundering, or other special treatment; and
> (4) are furnished to the employee in sufficient number, or the employee is reimbursed by the employer for the purchase of a sufficient number of uniforms, consistent with the average number of days per week worked by the employee.

*Id.* § 146-1.7(b); *see, e.g.*, *Camara v. Kenner*, No. 16-CV-7078, 2018 WL 1596195, at

*13–14 (S.D.N.Y. Mar. 29, 2018) (granting defendants summary judgment on the "wash

23

and wear" exception where "plaintiffs' uniforms were made of 'wash and wear' material, they were washed by the plaintiffs themselves, and there is no indication that the uniforms required any special cleaning procedures, such as ironing or dry cleaning").

Yunganaula was required to wear a uniform of "a cook hat, shirts[,] and pants." (Compl. ¶ 49; May 2020 Yunganaula Decl. ¶ 13). Yunganaula makes no suggestion that any part of his uniform required any maintenance beyond "laundering," (Mem. at 4), which does not entitle Yunganaula to maintenance pay, *see Camara*, 2018 WL 1596195, at *13. Because the Court cannot conclude, even taking Yunganaula's allegations as true, that Yunganaula is entitled to maintenance pay or that the "wash and wear" exemption does not apply here, the Court recommends this claim be denied.

   D.   Wage Theft Protection Act Claim

New York's Wage Theft Protection Act ("WTPA") requires that employers provide employees wage statements "with every payment of wages" that contain, among other things, the dates of work covered by the statement, the rate of pay, and gross and net wages paid. N.Y. Lab. Law § 195(3). The penalty for failing to provide those wage statements is $250 per day, up to $5000. *Id.* § 198(1-d). Yunganaula has alleged Defendants never provided him with any wage statements with his pay. (Compl. ¶ 48; May 2020 Yunganaula Decl. ¶ 12). This is sufficient to state a claim under the WTPA.[9]

   E.   Discrimination Claims

Yunganaula asserts two types of claims under both the NYSHRL and NYCHRL against all three Defendants: failure to make reasonable accommodations and

---

[9] While Yunganaula contends he was also not provided with a required notice when he was hired in 2006, (Compl. ¶ 47), he does not assert this claim in his Complaint.

discriminatory termination.  (Compl. ¶¶ 117–125, 127–34).  He abandons the reasonable-accommodation claims on his motion for default judgment.  (*See* Mem. at 20–22).  As a result, the Court only considers his claims for discriminatory termination.

       1.    <u>NYSHRL</u>

The NYSHRL provides it is "an unlawful discriminatory practice . . . [f]or an employer . . . , because of an individual's . . . disability, to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment."  N.Y. Exec. Law § 296(1)(a).[10]  On a default judgment motion, a plaintiff need only make out a *prima facie* case of discriminatory termination.  *Miller v. E. Midwood Hebrew Day Sch.*, No. 19-CV-5580, 2021 WL 966166, at *3 (E.D.N.Y. Feb. 15, 2021) ("[P]laintiff has presented a prima facie case of disability discrimination.  Defendant has failed to appear to offer a nondiscriminatory reason for its conduct.  Therefore, plaintiff's motion for a default judgment should be granted against defendant on plaintiff's claims under the ADA, the NYSHRL, and the NYCHRL."), *report and recommendation adopted*, 2021 WL 965072 (Mar. 15, 2021).

An employee establishes a *prima facie* case of discriminatory termination under the NYSHRL where she shows (1) her employers are covered by the statute, (2) she possesses a disability within the meaning of the statute, (3) she was qualified for the position from which she was terminated, and (4) her termination "occurred under

---

[10] This provision of the NYSHRL has been amended several times since the beginning of Yunganaula's employment, *see, e.g.*, 2020 N.Y. Sess. Laws ch. 137 (McKinney) (effective Aug. 11, 2020) (amending subsection on "reasonable accommodations" to include failure to provide for the use of a support animal)); but none of the amendments are relevant to Yunganaula's claims or remedies.

circumstances giving rise to an inference of discrimination." *Tibbetts v. Pelham Union Free Sch. Dist.*, 143 A.D.3d 806, 807 (2d Dep't 2016); *see also Jacobsen v. N.Y.C. Health & Hosps. Corp.*, 22 N.Y.3d 824, 834 (2014) ("The employee's complaint states a prima facie case of discrimination under both the State HRL and City HRL if the employee suffers from a statutorily defined disability and the disability caused the behavior for which the employee was terminated.").

Yunganaula has established a *prima facie* case under the NYSHRL against all Defendants.

First, Defendants are employers subject to NYSHRL. An individual is not considered an "employer" under the NYSHRL "if he is not shown to have any ownership interest or any power to do more than carry out personnel decisions made by others." *Patrowich v. Chem. Bank*, 63 N.Y.2d 541, 542 (1984) (per curiam). New York courts have also looked to "the 'economic reality' test for determining who may be sued as an 'employer' under the [NYSHRL]." *Kaiser v. Raoul's Rest. Corp.*, 72 A.D.3d 539, 540 (1st Dep't 2010) (collecting cases). Both Abreu and Garcia held ownership interests in Princess Pizza when Yunganaula was fired in 2019. (Jan. 2021 Yunganaula Decl. ¶¶ 5–6). And as set out *supra*, they were Yunganaula's employers under the "economic reality" test. Thus, in addition to Princess Pizza, they are both his "employers" under the NYSHRL and subject to liability for violations of the statute. *See, e.g.*, *Gutierrez v. Taxi Club Mgmt., Inc.*, No. 17-CV-532, 2018 WL 3432786, at *5 (E.D.N.Y. June 25, 2018) (finding individual owner of the corporate defendant liable as an employer under the NYSHRL on default), *report and recommendation adopted*, 2018 WL 3429903 (July 16, 2018).

Second, Yunganaula possessed a disability within the meaning of the NYSHRL.  A "disability" is "a physical, mental or medical impairment resulting from anatomical physiological or neurological conditions which prevents the exercise of a normal bodily function or is demonstrable by medically accepted clinical or laboratory diagnostic techniques."  N.Y. Exec. Law § 292(21)(a).  An employee with "a physical impairment that prevents the employee from performing the core duties of his or her job even with a reasonable accommodation, . . . does not have a disability covered by the statute, and consequently, the employer is free to take adverse employment action against the employee based on that impairment."  *Jacobsen*, 22 N.Y.3d at 834.  "A 'reasonable accommodation' . . . is one which 'permit[s] an employee . . . with a disability to perform in a reasonable manner the activities involved in the job' and does not impose an 'undue hardship' on the employer's business."  *Id.* (quoting N.Y. Exec. Law § 292(21)(e)).  For example, employees with temporary disabilities are entitled to a "reasonable accommodation in the form of a reasonable time for recovery."  9 N.Y.C.R.R. § 466.11(f)(6).  A stroke is a medically diagnosable impairment, *Wega v. Ctr. for Disability Rts. Inc.*, 395 F. App'x 782, 785 (2d Cir. 2010) (finding plaintiff established he possessed a disability under the more demanding ADA definition when he suffered a stroke), and thus a statutory disability under New York law.  And Yunganaula sufficiently demonstrated he could have returned to work with a reasonable accommodation—a limited medical leave.  Indeed, following his stroke, Yunganaula asked to return to work "several times."  (May 2020 Yunganaula Decl. ¶ 22).  On June 9, 2019, he told Garcia he wished to come back to work "within the next few weeks." (Compl. ¶ 64).  And on June 24, 2019, he requested a return to work.  (*Id.* ¶ 65).  As a

result, the Court finds Yunganaula has demonstrated he had a statutory disability within the meaning of the NYSHRL when he was terminated.

Third, Yunganaula was qualified for the position. This requirement is "minimal," "especially where discharge is at issue and the employer has already hired the employee." *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 91–92 (2d Cir. 2001). Yunganaula was a cook at Princess Pizza for 13 years, and it is therefore appropriate, absent any evidence to the contrary, to conclude he was qualified. *See Suarez v. Am. Stevedoring, Inc.*, No. 06-CV-6721, 2009 WL 3762686, at *11 (E.D.N.Y. Nov. 10, 2009) ("The undisputed evidence establishes that ASI initially sponsored plaintiff's employment contingent upon his clearance by the Waterfront Commission, which he obtained. It is also undisputed that plaintiff worked at ASI, among other NYSA-member employers, for nearly three years. Accordingly, plaintiff has satisfied the second element of his *prima facie* discrimination case." (citations omitted)).

And fourth, Yunganaula has also offered sufficient evidence "giving rise to an inference of discrimination." Yunganaula suffered a stroke on May 31, 2019. (May 2020 Yunganaula Decl. ¶¶ 16–20). He was terminated on June 28, 2019. (*Id.* ¶ 22). This 28-day gap is sufficient to draw an inference of causation. *See, e.g.*, *Pustilnik v. Battery Park City Auth.*, 71 Misc. 3d 1058, 1073 (Sup. Ct. 2021) (finding three-month gap between "the aggravation of [plaintiff's] condition and her firing" was "sufficient temporal proximity to raise an inference of discrimination . . . at the pleading stage"). As a result, the Court finds Defendants liable for discriminatory termination.

### 2. NYCHRL

Similar to the NYSHRL, the NYCHRL provides it is "an unlawful discriminatory practice . . . [f]or an employer or an employee or agent thereof, because of the actual or

perceived . . . disability, . . . [t]o discriminate against such person in compensation or in terms, conditions or privileges of employment."  N.Y.C. Admin. Code § 8-107(1)(a)(3). Unlike the NYSHRL, however, the NYCHRL's definition of "disability" does not exempt any disability for which no reasonable accommodation can be made.  *Jacobsen*, 22 N.Y.3d at 834–35; *accord* N.Y.C. Admin. Code § 8-102 (defining "disability" as "any physical, medical, mental or psychological impairment, or a history or record of such impairment").  Instead, employers are affirmatively required to make reasonable accommodations for employees with disabilities under the NYCHRL, *Estate of Benitez v. City of New York*, 193 A.D.3d 42, 47–48 (1st Dep't 2021), and the burden is on employers to demonstrate that no reasonable accommodation could have been made, *Jacobsen*, 22 N.Y.3d at 835.

An employee establishes a *prima facie* discrimination case under the NYCHRL where she shows (1) her employers are covered by the statute, (2) she possesses a disability within the meaning of the statute, (3) she was qualified for the position from which she was terminated; and (4) she was treated differently because of that disability. *Loc. 621 v. N.Y.C. Dep't of Transp.*, 178 A.D.3d 78, 81 (1st Dep't 2019); *Brathwaite v. Frankel*, 98 A.D.3d 444, 445 (1st Dep't 2012); *see also Jacobsen*, 22 N.Y.3d at 834.

Yunganaula has stated a claim against only Princess Pizza under the NYCHRL. Neither Garcia nor Abreu are Yunganaula's "employers" under the statute.  "Employer" is defined more narrowly in the context of the NYCHRL than the NYSHRL; unlike under the NYSHRL, "employees, agents, and others with others with an ownership stake are not employers within the meaning of the [statute]."  *Doe v. Bloomberg, L.P.*, 36 N.Y.3d 450, 460 (2021).

Yunganaula has demonstrated, however, that he possessed a statutory disability, was qualified to perform the essential functions of his job, and was terminated for his disability. *See supra* Part II.E.1. As a result, he has stated a claim for discriminatory termination under the NYCHRL against Princess Pizza.

III.   Damages and Other Relief

"While a party's default is deemed to constitute a concession of all well-pleaded allegations of liability, it is not considered an admission of damages." *Greyhound Exhibitgroup,* 973 F.2d at 158. "[A]lthough the default establishes a defendant's liability, unless the amount of damages is certain, the court is required to make an independent determination of the sum to be awarded." *Griffiths v. Francillon*, No. 10-CV-3101, 2012 WL 1341077, at *1 (E.D.N.Y. Jan. 30, 2012) (quoting *Ann Taylor, Inc. v. Interstate Motor Carrier, Inc.*, No 03-CV-7502, 2004 WL 2029908, at *3 (S.D.N.Y. Sept. 13, 2004)), *report and recommendation adopted*, 2012 WL 1354481 (Apr. 13, 2012). "The court must conduct an inquiry to ascertain the amount of damages with reasonable certainty." *Joe Hand Promotions, Inc. v. El Norteno Rest. Corp.*, No. 06-CV-1878, 2007 WL 2891016, at *2 (E.D.N.Y. Sept. 28, 2007) (adopting report and recommendation) (citing *Transatlantic Marine Claims Agency, Inc. v. Ace Shipping Corp.*, 109 F.3d 105, 111 (2d Cir. 1992)). "Where, on a damages inquest, a plaintiff fails to demonstrate its damages to a reasonable certainty, the court should decline to award any damages even though liability has been established through default." *Lenard v. Design Studio*, 889 F. Supp. 2d 518, 527 (S.D.N.Y. 2012) (adopting report and recommendation) (collecting cases).

That being said, because under FLSA "[t]he burden is on an employer properly to record hours," "[a] plaintiff need not compute FLSA damages with precision." *Harold*

*Levinson Assocs., Inc. v. Chao*, 37 F. App'x 19, 20–21 (2d Cir. 2002).  An employee may meet his burden of showing the amount and extent of his hours worked "solely through his own recollection."  *See Pineda v. Masonry Constr., Inc.*, 831 F. Supp. 2d 666, 674 (S.D.N.Y. 2011).  As such, "[i]n a FLSA case, in the absence of rebuttal by defendants, plaintiffs' recollection and estimates of hours worked are presumed to be correct."  *Ting Yao Lin v. Hayashi Ya II, Inc.*, 08-CV-6071, 2009 WL 289653, at *3 (S.D.N.Y. Jan. 30, 2009) (collecting cases), *report and recommendation adopted*, 2009 WL 513371 (S.D.N.Y. Feb. 27, 2009).

    A.    <u>Overtime Wages</u>

Both federal and New York law require that employers pay employees a 50 percent premium for their overtime hours—that is, the hours in excess of 40 that they have worked in each workweek.  29 C.F.R. § 778.105; 12 N.Y.C.C.R. § 146-1.4.  Yunganaula is not entitled to recover under both FLSA and NYLL for overtime earned during the same period.  *See Gamero v. Koodo Sushi Corp.*, 272 F. Supp. 3d 481, 498 (S.D.N.Y. 2017) (collecting cases).  "If 'a plaintiff is entitled to damages under both federal and state wage law, the Court has discretion to award [that plaintiff] damages under the statute providing the greatest amount of relief.'"  *Id.* (alteration in original) (quoting *Hengjin Sun v. China 1221, Inc.*, No. 12-CV-7135, 2016 WL 1587242, at *2 (S.D.N.Y. Apr. 19, 2016)).  Yunganaula's recovery under NYLL, by virtue of the longer statute of limitations and hospitality industry regulations, which credit an employee's weekly salary—no matter how large—to the first 40 hours of work, is substantially greater than any recovery under FLSA.  *See supra* Parts III.A.1.c, III.A.2.b.  When confronted with similarly large disparities, courts have concluded that awarding the substantially greater sum is appropriate.  *Romero*, 2017 WL 4480758, at *12 n.11; *Bing*

31

*Zhang v. Red Mountain Noodle House Inc.*, No. 15-CV-628, 2016 WL 4124304, at *3
(E.D.N.Y. July 5, 2016) ("[T]his Court will calculate Plaintiffs' regular rate for the
purposes of unpaid overtime compensation using the NYLL Hospitality Industry Wage
Order's method of calculation, since it will entitle them to a higher recovery and prevent
minimum wage violations."), *report and recommendation adopted*, 2016 WL 4099090
(Aug. 2, 2016).  This Court sees no legal basis to deviate from that practice in this case
and recommends that Yunganaula be awarded $253,341.24 in overtime wages as set
forth below.

| Time Period | 11/5/13[11] to 12/31/13 | 2014 | 2015 | 2016 | 2017 | 2018 | 1/1/19 to 5/31/19 | Total |
|---|---|---|---|---|---|---|---|---|
| Number of Workweeks | 8 | 50 | 50 | 50 | 50 | 50 | 22 | |
| Average Hours Worked Per Week[12] | 72.125 | 73.98 | 73.98 | 74.9 | 77.3 | 74.9 | 73.91 | |
| Average Overtime Hours Worked Per Week | 32.125 | 33.98 | 33.98 | 34.9 | 37.3 | 34.9 | 33.91 | |
| Hourly Wage Rate | $14.50 | $14.50 | $15 | $17 | $19 | $20 | $20.17[13] | |
| Hourly Overtime Wage Rate | $21.75 | $21.75 | $22.50 | $25.50 | $28.50 | $30 | $30.26 | |
| Overtime Wages Owed | $5,589.75 | $36,953.25 | $38,227.50 | $44,497.50 | $53,152.50 | $52,350.00 | $22,570.74 | **$253,341.24** |

---

[11] While Yunganaula seeks recovery dating back to May 2013, the Court limits his recovery to the applicable six-year statute of limitations; that is, to November 5, 2013.

[12] This is calculated based on his request for a 50-week year, (Mem. at 17), and in light of Yunganaula's allegations that: (1) from 2013 to 2015 he typically worked 72 hours a week, (2) from 2016 onwards he typically worked 74 hours a week; (3) 3 or 4 times a year he worked 73 hours a week when Princess Pizza catered parties, and (4) after he assumed a managerial role, Garcia took a four to five week vacation where he worked 86 hours a week.  For these calculations, the Court uses the lower numbers (for example, four-week rather than five-week vacations) and assumes a *pro rata* number of catered parties a year (meaning, in 2013, the Court accounts for only one 73-hour week, and in 2019, the Court accounts for two 73-hour weeks).

[13] This is calculated as an average to account for Yunganaula's assertion he was paid $950 for his final week of work. (Compl. ¶ 40).

B.    Spread-of-Hours Compensation

"Spread of hours compensation is calculated by multiplying the minimum wage by the number of days an employee worked more than ten hours." *Cabrera v. 1560 Chirp Corp.*, No. 15-CV-8194, 2017 WL 1289349, at *6 (S.D.N.Y. Mar. 6, 2017) (quoting *Angamarca v. Pita Grill 7 Inc.*, No. 11-CV-7777, 2012 WL 3578781, at *8 (S.D.N.Y. Aug. 2, 2012), *report and recommendation adopted*, 2012 U.S. Dist. LEXIS 190479 (Dec. 14, 2012)), *report and recommendation adopted*, 2017 WL 1314123 (Apr. 6, 2017); *see* 12 N.Y.C.C.R. § 142-2.4.  Yunganaula seeks $18,340.50 in spread of hours pay.  (Mem. at 18).  Yunganaula worked more than 10 hours per day for each day of his employment, which results in the following spread-of-hours calculations:[14]

| Time Period | 11/5/13 to 12/31/13 | 2014 | 2015 | 2016 | 2017 | 2018 | 1/1/19 to 5/31/19 | Total |
|---|---|---|---|---|---|---|---|---|
| Workdays Per Week | 6 | 6 | 6 | 6 | 6 | 6 | 6 | |
| Weeks Worked | 8 | 50 | 50 | 50 | 50 | 50 | 22 | |
| NY Minimum Wage | $7.25 | $8.00 | $8.75 | $9.00 | $11.00 | $13.00 | $15.00 | |
| Spread-of-Hours Pay Owed | $348.00 | $2,400.00 | $2,625.00 | $2,700.00 | $3,300.00 | $3,900.00 | $1,980.00 | **$17,253.00** |

As a result, the Court recommends Yunganaula be awarded $17,253.00 in spread-of-hours compensation.

C.    Liquidated Damages

Yunganaula also seeks liquidated damages under the NYLL.  An employee can recover liquidated damages under the NYLL "unless the employer proves a good faith basis for believing that its underpayment of wages was in compliance with the law."  N.Y. Lab. Law § 198(1-a).  An employer is liable for liquidated damages equal to 100 percent of the total amount of wages found to be due.  *See id.* § 663(1); *Calle v. Yoneles*

---

[14] Even though Yunganaula avers he worked seven days a week during stretches of his employment, (*e.g.*, Compl. ¶¶ 29–30), he only seeks spread-of-hours compensation for six days a week throughout his employment, (Mem. at 18).

*Enters., Inc.*, No. 16-CV-1008, 2017 WL 6942652, at *15 (E.D.N.Y. Oct. 24, 2017), *report and recommendation adopted*, 2018 WL 401269 (Jan. 12, 2018).

In light of Defendants' default, there has been no showing that they acted in good faith or the Court should exercise its discretion to deny liquidated damages. *See Brock v. Wilamowsky*, 833 F.2d 11, 19 (2d Cir. 1987) (noting that employer bears burden of establishing good faith defense under § 260 through "plain and substantial evidence"); *Khan v. IBI Armored Servs., Inc.*, 474 F. Supp. 2d 448, 459 (E.D.N.Y. 2007) ("Simply put, '[d]ouble damages are the norm, single damages the exception[.]'" (alteration in original) (quoting *Walton v. United Consumers Club, Inc.*, 786 F.2d 303, 310 (7th Cir. 1986))); *Xochimitl*, 2016 WL 4704917, at *15 ("In situations where 'defendants never made this showing in light of their default, they have not rebutted the presumption in favor of a liquidated damages award.'" (quoting *Guaman v. J & C Top Fashion, Inc.*, No. 14-CV-8143, 2016 WL 971230, at *7 (S.D.N.Y. Feb. 22, 2016))).  Therefore, the Court recommends that liquidated damages be awarded in the amount of $270,594.24.

D.    Prejudgment Interest

Yunganaula seeks prejudgment interest on his wage-and-hour claims only. (Mem. at 19).[15]  Although it is settled law that prejudgment interest is not awardable under FLSA when liquidated damages are awarded, *Begum v. Ariba Disc., Inc.*, 12-CV-6620, 2015 WL 223780, at *3 (S.D.N.Y. Jan. 16, 2015) (adopting report and recommendation), "NYLL permits the award of both liquidated damages and pre-judgment interest," *Fermin v. Las Delicias Peruanas Rest., Inc.*, 93 F. Supp. 3d 19, 48

---

[15] While prejudgment interest is available on back pay awards under the NYSHRL and NYCHRL, *see, e.g.*, *Antoine v. Brooklyn Maids 26, Inc.*, 489 F. Supp. 3d 68, 94 (E.D.N.Y. 2020), because Yunganaula does not seek it, (*see* Mem. at 19), the Court does not consider it.

(E.D.N.Y. 2015).  Yunganaula is entitled to an award of prejudgment interest on his NYLL unpaid wages at a rate of nine percent per year.  C.P.L.R. § 5004.  Where, as here, unpaid wages are "incurred at various times, interest shall be computed . . . from a single reasonable intermediate date."  *Id.* § 5001(b); *Coulibaly v. Millennium Super Car Wash, Inc.*, 12-CV-4760, 2013 WL 6021668, at *15 (E.D.N.Y. Nov. 13, 2013) (adopting report and recommendation).  Courts have discretion in choosing a reasonable date from which to calculate prejudgment interest.  *See Fermin*, 93 F. Supp. 3d at 49.  The "most commonly used" intermediate date is "[t]he median date between the earliest ascertainable date the cause of action existed and the date the action was filed.  *Gunawan v. Sake Sushi Rest.*, 897 F. Supp. 2d 76, 93 (E.D.N.Y. 2012); *see also, e.g.*, *Romero*, 2017 WL 4480758, at *14.

The unpaid overtime wages and spread-of-hours compensation due to Yunganaula under the NYLL is $270,594.24.  The relevant period of employment for those wages is November 5, 2013 through May 31, 2019.  This action was filed on November 5, 2019.  (Compl.).  The midpoint between November 5, 2013 and May 31, 2019 is November 4, 2016.  The Court recommends that prejudgment interest be awarded in a daily amount of $66.72 from November 4, 2016, until the date final judgment is entered.[16]

 E. <u>Wage Theft Protection Act Damages</u>

Yunganaula never received a wage statement with his wages.  (Compl. ¶ 48; May 2020 Yunganaula Decl. ¶ 12).  He worked for Princess Pizza for the entirety of the six-

---

[16] The total amount ($270,594.24) at nine percent annually results in approximately $24,353.48 per year in interest, or $66.72 per day (rounded) based on 365 days per calendar year.

year statute of limitations period for WTPA damages.  He is entitled to recover $250 per workday that "violations occurred or continue[d] to occur," up to a maximum of $5000.  N.Y. Lab. Law § 198(1-d).  Because violations continued to occur for well over 20 workdays, Yunganaula is entitled to the statutory maximum of $5000.

   F.   Back Pay

   Victims of employment discrimination under the NYSHRL and NYCHRL may be awarded back pay.  *Gutierrez*, 2018 WL 3432786, at *6–7.  "Although not automatic, an award of back pay is generally awarded absent special circumstances."  *Cavalotti v. Daddyo's BBQ, Inc.*, No. 15-CV-6469, 2018 WL 5456654, at *26 (E.D.N.Y. Sept. 8, 2018) (citing *Carrero v. N.Y.C. Hous. Auth.*, 890 F.2d 569, 580 (2d Cir. 1989)), *report and recommendation adopted*, 2018 U.S. Dist. LEXIS 165835 (Sept. 25, 2018).  Back pay is typically measured from the date of termination to the date of the inquest, *Gutierrez*, 2018 WL 3432786, at *7, or entry of judgment, *Antoine*, 489 F. Supp. 3d at 92.  "Generally, an individual complaining of discrimination has a duty to mitigate his or her damages by making reasonable efforts to obtain comparable employment."  *Goldberg v. N.Y.S. Div. of Hum. Rts.*, 85 A.D.3d 1166, 1167 (2d Dep't 2011).  To account for mitigation of losses, "new earnings made during the back pay period are deducted from the back pay award."  *Francis v. Ideal Masonry, Inc.*, No. 16-CV-2839, 2018 WL 4292171, at *9 (E.D.N.Y. Aug. 3, 2018), *report and recommendation adopted*, 2018 WL 4288625 (Sept. 4, 2018); *see, e.g.*, *N.Y.S. Div. of Hum. Rts. v. A.R. Heflin Painting Contractor, Inc.*, 101 A.D.3d 1442, 1445 n.2 (3d Dep't 2012) (calculating back pay award by subtracting wages earned "for temporary work" undertaken after discriminatory termination by respondent).

Yunganaula was fired from Princess Pizza on June 28, 2019.  (May 2020 Yunganaula Decl. ¶ 22).  He procured a new, part-time job in August 2019.  (*Id.* ¶ 24). At his new position, Yunganaula works 36 hours per week and is paid $15 per hour. (*Id.*).  He is still employed there.  (*Id.*).  He seeks back pay for July 1, 2019 to December 31, 2019 only, or 26 weeks (rounded down), paid at the minimum wage rate of $15.00. (Mem. at 21 & n.99).  Accounting for his later employment, the Court recommends he be awarded $25,725.00 in back pay as set forth below.  The Court further recommends that back pay be awarded pursuant to the NYSHRL, and as a result all Defendants are jointly and severally liable for the full amount.

| | Number of Weeks | Hourly Rate | Average Hours Per Week[17] | Straight Time Back Pay | Overtime Back Pay | |
|---|---|---|---|---|---|---|
| Back Pay | 26 | $15 | 73 | $15,600.00 | $19,305.00 | $34,905.00 |
| *Mitigation* | *17[18]* | *$15* | *36* | | | *$9,180.00* |
| Total Back Pay Owed | | | | | | $25,725.00 |

G.  Emotional-Distress Damages

Victims of employment discrimination under the NYSHRL and NYCHRL may also recover emotional-distress damages.  *Gutierrez*, 2018 WL 3432786, at *9.  Courts in this Circuit generally categorize emotional-distress damages as "garden variety," "significant," or "egregious."  *Sooroojballie v. Port Auth. of N.Y. & N.J.*, 816 F. App'x 536, 546 (2d Cir. 2020).  Courts apply this framework when determining a damages award on a default judgment motion as well as when evaluating the propriety of a jury award.  *See Antoine*, 489 F. Supp. 3d at 96.

---

[17] Yunganaula calculated back pay with an average of 75 hours per week, (Mem. at 21); the Court uses 73 hours a week, his regularly weekly schedule in 2019.

[18] *See* Mem. at 21 n.103.

Garden-variety emotional-distress damages are warranted in cases where "the evidence of emotional harm is limited to the plaintiff's testimony, which describes his or her injuries in vague or conclusory terms," and is "not supported by medical testimony." *Sooroojballie*, 816 F. App'x at 546 (quoting *Maher v. Alliance Mortg. Banking Corp.*, No. 06-CV-5073, 2010 WL 3516153, at *2 (E.D.N.Y. Aug. 9, 2010), *report and recommendation adopted*, 2010 WL 3521921 (Sept. 1, 2020)); *see, e.g.*, *Cavalotti*, 2018 WL 5456654, at *27–28 (finding garden-variety emotional-distress damages appropriate where "Plaintiff did not attest to, or submit evidence of, seeking medical or mental health treatment; did not provide details of her experience of distress; and . . . her employment was relatively brief"). These awards range between $6,500 and $46,000. *Antoine*, 489 F. Supp. 3d at 97 & n.11 (adjusting for inflation).

"Significant" emotional-distress damages are appropriate when a prevailing plaintiff corroborates her claims of emotional distress but does not suffer severe physical effects from the discrimination. *Sooroojballie*, 816 F. App'x at 546–47; *see, e.g.*, *Rainone v. Potter*, 388 F. Supp. 2d 120, 123–26 (E.D.N.Y. 2005)) (finding "significant" emotional-distress damages warranted where plaintiff was treated for major depression for several years and corroborated his claims with his wife's testimony, but was not "debilitat[ed]"). Courts typically award between $65,000 and $131,000 in these cases. *Antoine*, 489 F. Supp. 3d at 97 & n.11 (adjusting for inflation).

"Egregious" emotional-distress damages are warranted when the discriminatory conduct was "outrageous and shocking or affected the physical health of the plaintiff." *Sooroojballie*, 816 F. App'x at 546 (quoting *Maher*, 2010 WL 3516153, at *2); *see, e.g.*, *Antoine*, 489 F. Supp. 3d at 97–99 (awarding egregious emotional-distress damages where plaintiff was raped repeatedly by her employer, forced to move into a domestic

39

violence shelter, and suffered from PTSD).  Courts generally award over $131,000 in

these cases.  *See Antoine*, 489 F. Supp. 3d at 97, 99–100 (awarding $200,000 and

collecting cases).

Yunganaula worked for Princess Pizza for almost 13 years.  (May 2020

Yunganaula Decl. ¶¶ 22–23; Compl. ¶ 19).  He experienced a serious medical emergency

at work, (May 2020 Yunganaula Decl. ¶¶ 16–20), that required him to be hospitalized

for three days, (*id.* ¶ 21).  The record offers no explanation for his firing beyond his

inability to work for the few weeks following his stroke.  Yunganaula asserts that he

"ha[s] suffered and continue[s] to suffer severe emotional distress, including insomnia,

depression, night sweats, anxiety, stress, shame, embarrassment, sadness, loss of self-

worth, loss of appetite, fear for my family's livelihood, and other emotional pain and

suffering, such as social isolation."  (*Id.* ¶ 23; *accord* Compl. ¶¶ 125, 134 ("Plaintiff

Yunganaula has suffered and continues to suffer, *inter alia*, . . . emotional distress,

mental anguish, emotional pain and suffering, inconvenience, [and] loss of enjoyment of

life[.]")).  Yunganaula provides no corroborating evidence of his emotional distress, such

as medical documentation of depression or anxiety, *see, e.g.*, *Moore v. Houlihan's Rest.,

Inc.*, No. 07-CV-3129, 2011 WL 2470023, at *7 (E.D.N.Y. May 10, 2011) (recommending

$50,000 in emotional-distress damages on default where plaintiff included a report by

his psychiatrist), *report and recommendation adopted*, 2011 WL 2462194 (June 17,

2011), or a supporting affidavit by a family member or friend, *see, e.g.*, *Vargas v.

Premiere Staff Agency*, No. 17-CV-4280, 2019 WL 10632865, at *6–7 (S.D.N.Y. July 18,

2019) (recommending $30,000 in emotional-distress damages on default where

plaintiff provided supporting affidavits by her fiancé and a friend), *report and

recommendation adopted*, 2020 WL 5663412 (Sept. 23, 2020).  He also provides no

additional detail on how getting fired from Princess Pizza has impacted, or continues to impact, his day-to-day life or his mental health.

The Court respectfully recommends Yunganaula be awarded $30,000 in emotional-distress damages. Yunganaula was terminated after suffering a serious stroke, notwithstanding his ability to return to work a few short weeks after his hospitalization and his many years of employment. No attempt was made to accommodate his short-term disability and there was no indication that he could not perform his job as he was previously able to do. As a result of Defendants' actions, he felt sad, anxious, and ashamed. That being said, he has presented no medical evidence or corroboration of any kind of his suffering or symptoms or any indication that he has lingering and ongoing mental health or other emotional distress resulting from his termination. As such, the Court concludes that an award of $30,000 for garden-variety emotional-distress damages is appropriate. The Court further recommends that these damages be awarded pursuant to the NYSHRL, and as a result that all Defendants are jointly and severally liable for the full amount.[19]

H.    Attorney's Fees

Yunganaula seeks a total of $37,060.00 in attorney's fees to compensate for 119.7 hours worked on the case. (Mem. at 22–25; Activities Export dated Jan. 11, 2021 ("Time Entries"), attached as Ex. D to Lipsky Decl., Dkt. No. 35). When assessing whether legal fees are reasonable, the Court determines the "presumptively reasonable fee" for an attorney's services by examining what reasonable clients would be willing to pay. *See*

---

[19] Because Yunganaula could not recover damages under both the NYSHRL and NYCHRL for the same injury, the Court declines to award damages under the NYCHRL, which would only be available from Princess Pizza.

41

*Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany*, 522 F.3d 182, 183–84 (2d Cir. 2008).  To calculate the presumptively reasonable fee, a court must first determine a reasonable hourly rate for the legal services performed.  *See id.*  The next step is to determine the reasonableness of the hours expended by counsel.  *See, e.g., LaBarbera v. Empire State Trucking, Inc.*, No. 07-CV-669, 2008 WL 746490, at *4–5 (E.D.N.Y. Feb. 26, 2007), *report and recommendation adopted*, 2008 U.S. Dist. LEXIS 21770 (Mar. 19, 2008).  The number of hours spent on a lawsuit are considered unreasonable if they are "excessive, redundant, or unnecessary."  *See, e.g., LaBarbera v. Frank J. Batchelder Transp. LLC*, No. 08-CV-3387, 2009 WL 240521, at *4 (E.D.N.Y. Feb. 2, 2009) (adopting report and recommendation) (quoting *Gierlinger v. Gleason*, 160 F.3d 858, 876 (2d Cir. 1998)).

With respect to the reasonable hourly rate, the Court examines the experience and qualifications of counsel seeking the fee award.  Yunganaula was represented in this case by two attorneys: Douglas Lipsky ("Lipsky") and Milana Dostanitch ("Dostanitch") of the law firm Lipsky Lowe LLP.  (Mem. at 23; Lipsky Decl. ¶ 1).  Lipsky is a partner and has practiced law for employment law for over 17 years.  (Mem. at 23).  Dostanitch graduated from Fordham University School of Law in 2014, is a sixth-year associate, and exclusively practices employment law.  (*Id.* at 23–24).  Lipsky seeks an hourly rate of $400, Dostanitch an hourly rate of $300.  (*Id.*).

In FLSA cases in this District, "the prevailing hourly rate for partners . . . ranges from $300.00 to $400.00, and a reasonable hourly rate for a senior associate ranges from $200 to $300."  *Marshall v. Deutsche Post DHL*, No. 13-CV-1471, 2015 WL 5560541, at *9 (E.D.N.Y. Sept. 21, 2015) (quoting *Hui Luo v. L & S Acupuncture, P.C.*, No. 14-CV-1003, 2015 WL 1954468, at *9 (E.D.N.Y. Sept. 21, 2015)); *see, e.g., Lopez*,

2018 WL 1770660, at *13 (in FLSA default case, recommending $350 hourly rate for founding partner and $175 for junior associate).  As such, the rates for Lipsky and Dostanitch are at the high end of the acceptable ranges for their experience level.

Awarding fees at the higher end of these ranges, however, is inappropriate given the default posture of this case.  *Lopez*, 2018 WL 1770660, at *13; *see also Gonzales*, 2014 WL 1011070, at *19.  The nature of the work performed in this matter was relatively straightforward, particularly since Defendants defaulted, and no novel or complex issues were raised by Yunganaula.  As such, the Court recommends Lipsky's hourly rate be reduced to $350, while Dostanitch's hourly rate be reduced to $250.

Turning next to the reasonableness of the time expended, according to their contemporaneous billing records, Yunganaula's counsel spent 119.6 hours litigating this case: Lipsky billed 11.5 hours, and Dostanitch 108.1[20] hours.  The Court finds this is unreasonably high and recommends it be reduced in the following ways.

First, counsel's contemporaneous billing records shows Dostanitch engaged in block billing.  "Block billing" is the practice of "grouping multiple tasks into a single billing entry."  *Charles v. City of New York*, No. 13-CV-3547, 2014 WL 4384155, at *5 (S.D.N.Y. Sept. 4, 2014).  "Although there is no per se rule against block billing, to justify an award of attorneys' fees, counsel must provide enough information for the Court to assess the reasonableness of the hours worked on each discrete project."  *Id.* (citation omitted); *accord Annuity, Welfare & Apprenticeship Skill Improvement & Safety Funds of the Int'l Union of Operating Eng'rs, Loc. 15, 15A, 15C & 15D v. Coastal Env't*

---

[20] This total excludes one of Dostanitch's entries, dated November 30, 2020, of 0.1 hours, which relates to a different case.  (Time Entries at 14 ("Emailed Raul Yunganaula following up on edits to the DP Group complaint.")).

*Grp. Inc.*, No. 18-CV-5791, 2019 WL 5693916, at *11 (E.D.N.Y. Aug. 30, 2019), *report and recommendation adopted*, Order (Mar. 31, 2021).  Of Dostanitch's 108.1 hours spent on this matter, 90.8 hours were block billed.  (*See* Time Entries).  As a result, the Court recommends these hours be reduced by one-third.  *See, e.g., Annuity, Welfare & Apprenticeship Skill Improvement & Safety Funds of the Int'l Union of Operating Eng'rs, Loc. 15, 15A, 15C & 15D v. Coastal Env't Grp. Inc.*, No. 18-CV-5791, 2021 WL 1842939, at *2 (E.D.N.Y. Mar. 16, 2021) (recommending block-billed entries by reduced by one-third), *report and recommendation adopted*, Order (Mar. 31, 2021); *Charles*, 2014 WL 4384155, at *6 (reducing block-billed entries by 30 percent in calculating fee award).

And second, the number of hours billed in this matter overall is unreasonably high.  It far exceeds the approved number of hours in comparable cases, that is, cases on default concerning both wage-and-hour violations and employment discrimination.  *See, e.g.*, *Setty v. Synergy Fitness*, No. 17-CV-6504, 2018 WL 8415414, at *20 (E.D.N.Y. Dec. 18, 2018) (29.5 hours in gender discrimination and wage-and-hour case with multiple plaintiffs), *report and recommendation adopted*, 2019 WL 1292431 (Mar. 20, 2019); *Cavalotti*, 2018 WL 5456654, at *31 (42.45 hours in sexual harassment and wage-and-hour case with one plaintiff).

"When reducing an award due to excessive hours, a court need not make item-by-item findings."  *Manswell v. Heavenly Miracle Acad. Servs., Inc.*, No. 14-CV-7114, 2017 WL 9487194, at *22 (E.D.N.Y. Aug. 23, 2017) (citing *Lunday v. City of Albany*, 42 F.3d 131, 134 (2d Cir. 1994)), *report and recommendation adopted*, 2017 WL 4075180 (Sept. 14, 2017).  Instead, courts have discretion to make "across-the-board" reductions where billing records are clearly excessive.  *Id.* (quoting *In re Agent Orange Prod. Liab. Litig.*,

44

818 F.2d 226, 237 (2d Cir. 1987)); *see, e.g., Moore*, 2011 WL 2470023, at \*7–8 & n.11
(recommending one-third across-the-board reduction in attorney's fee award in default
employment-discrimination suit).  Because the hours billed here are excessive, even
after accounting for block billing, the Court recommends a further across-the-board
reduction by 40 percent.  As set forth below, the Court recommends an award of
attorney's fees of $14,090.

|  | Requested Rate | Reduced Rate | Requested Hours | Reduced Hours | Total |
|---|---|---|---|---|---|
| Lipsky | $400 | $350 | 11.5 | 6.9 | $2415 |
| Dostanitch | $300 | $250 | 108.2 | 46.7 | $11,675 |
| Total |  |  |  | 53.6 | $14,090 |

I.    Costs

Yunganaula seeks reimbursement of costs consisting of $400 in court fees and
$320 in service-of-process fees.  (Activities Export dated Jan. 11, 2021 ("Costs
Records"), attached as Ex. E to the Lipsky Decl., Dkt. No. 35).  Under both FLSA and
NYLL, a prevailing plaintiff is entitled to recover costs from the defendants. *See* 29
U.S.C. § 216(b); N.Y. Lab. Law § 663(1).  Recoverable costs include filing fees and
process server fees. *See Lopez*, 2018 WL 1770660, at 14 (citing *Teamsters Loc. 814
Welfare Fund v. Dahill Moving & Storage Co.*, 545 F. Supp. 2d 260, 269 (E.D.N.Y.
2008)).  Only costs tied to "identifiable, out-of-pocket disbursements" are recoverable.
*Keun-Jae Moon v. Joon Gab Kwon*, No. 99-CV-11810, 2002 WL 31512816, at \*8
(S.D.N.Y. Nov. 8, 2002) (quoting *Kuzma v. IRS*, 821 F.2d 930, 933–34 (2d Cir. 1987)).

Filing fees are recoverable without supporting documentation if verified by the
docket. *E.g., Shalto v. Bay of Bengal Kabob Corp.*, No. 12-CV-920, 2013 WL 867420, at
\*2 (E.D.N.Y. Mar. 7, 2013) (adopting a report and recommendation in part); *Philpot v.
Music Times LLC*, No. 16-CV-1277, 2017 WL 9538900, at \*11 (S.D.N.Y. Mar. 29, 2017)

(stating that the filing fee is "a fact of which the Court can take judicial notice"), *report and recommendation adopted*, 2017 WL 1906902 (May 9, 2017). The docket indicates the $400 filing fee was paid. (Dkt. No. 1). Therefore, although Yunganaula did not submit a receipt, the filing fee should be awarded.

Process server fees are also recoverable, but they must be supported by documentation. *See Martinez v. Alimentos Saludables Corp.*, No. 16-CV-1997, 2017 WL 5033650, at *29 (E.D.N.Y. Sept. 22, 2017) (recommending that the plaintiffs not be awarded process server fees absent supporting documentation and noting that "failure to provide adequate documentation of costs incurred will limit, or even defeat, recovery"), *report and recommendation adopted*, 2017 U.S. Dist. LEXIS 174714 (Oct. 18, 2017); *Sheldon v. Plot Com.*, No. 15-CV-5885, 2016 WL 5107072, at *20 (E.D.N.Y. Aug. 26, 2016) (recommending the costs for serving defendant "be denied due to lack of adequate documentation"), *report and recommendation adopted*, 2016 WL 5107058 (Sept. 19, 2016). Yunganaula does not provide invoices for service of process, but he provides his counsel's billing records, indicating counsel paid $40 for service upon Garcia, $95 for service on Abreu, and $185 for service on Princess Pizza. (Costs Records). Because Yunganaula provides no additional details on the process-server fees (*e.g.*, an invoice or the number of hours spent on service), these fees are not recoverable.[21] *See, e.g.*, *Lopez*, 2018 WL 1770660, at *14.

Therefore, the Court respectfully recommends an award of $400 in costs.

---

[21] While courts have discretion to grant appropriate process server fees, such fees must be within the range of costs that would have been incurred had the United States Marshal Service effected service, *see United States v. Merritt Meridian Constr. Co.*, 95 F.3d 153, 172 (2d Cir. 1996), which is currently $65 per hour, 28 C.F.R. § 0.114(a)(3).

CONCLUSION

For the reasons stated above, it is respectfully recommended that the motion for default judgment be granted in part and denied in part, that default judgment be entered jointly and severally against all three Defendants, and Yunganaula be awarded:

- $253,341.24 in overtime wages;
- $17,253.00 in spread-of-hours compensation;
- $270,594.24 in liquidated damages;
- prejudgment interest in the amount of $66.72 per day from November 4, 2016 until the entry of final judgment;
- $5000.00 in statutory damages under the WPTA;
- $25,725.00 in back pay;
- $30,000.00 in emotional-distress damages;
- $14,090.00 in attorney's fees; and
- $400 in costs.

That is, the Court recommends a total award of $616,403.48, plus interest of $66.72 per day from November 4, 2016 until the entry of final judgment. The Court further recommends "if any amounts remain unpaid upon the expiration of ninety days following issuance of judgment, or ninety days after expiration of time to appeal and no appeal is then pending, whichever is later, the" recovery flowing from Defendants' overtime wage, spread-of-hours, and wage-statement violations "automatically increase by fifteen percent." N.Y. Lab. Law § 198(4); *see, e.g.*, *De la Cruz Casarrubias v. Surf Ave Wine & Liquor Inc.*, No. 20-CV-3003, 2021 WL 2227977, at *13 (E.D.N.Y. May 11, 2021), *report and recommendation adopted*, 2021 WL 2223275 (June 2, 2021). The Court finally recommends that the minimum-wage, uniform purchase cost and maintenance pay, and reasonable-accommodation claims, for which Yunganaula is either not seeking or not being awarded recovery, to be dismissed without prejudice.

Any objections to the Report and Recommendation above must be filed with the Clerk of the Court within 14 days of receipt of this report. Failure to file objections

within the specified time waives the right to appeal any judgment or order entered by the District Court in reliance on this Report and Recommendation. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2); *Caidor v. Onondaga County*, 517 F.3d 601, 604 (2d Cir. 2008) ("[F]ailure to object timely to a magistrate [judge's] report operates as a waiver of any further judicial review of the magistrate [judge's] decision.").

Yunganaula shall serve a copy of this Report and Recommendation on Defendants by mail and file proof of such service in the record.

SO ORDERED.

*/s/ Sanket J. Bulsara* August 11, 2021
SANKET J. BULSARA
United States Magistrate Judge

Brooklyn, New York

48